Michael E. Waller (Attorney ID No. 031921990)
  Michael.Waller@klgates.com
Alyssa F. Conn (Attorney ID No. 239332017)
  Alyssa.Conn@klgates.com

**K&L GATES LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
(973) 848-4000
*Attorneys for Plaintiff Jeffrey Tretter*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEFFREY TRETTER, | |
| Plaintiff, | Case No. _____ |
| | Hon. _____, U.S.D.J. |
| v. | Hon. _____, U.S.M.J. |
| ROBERT BRESNAHAN, JR and | |
| J.L. SADOWSKY, LLC., | **COMPLAINT** |
| | **AND JURY DEMAND** |
| Defendants. | |

Plaintiff Jeffrey Tretter ("Mr. Tretter") by his undersigned counsel, for his Complaint against Defendants Robert Bresnahan, Jr. ("Bresnahan") and J.L. Sadowsky, LLC ("J.L. Sadowsky") (collectively "Defendants"), alleges as follows:

### NATURE OF THE ACTION

1.     Mr. Tretter brings this action against Defendant Bresnahan for violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d); and the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO"), N.J.S.A. 2C:41-2; and against Defendants Bresnahan and J.L. Sadowsky for state common law and equitable fraud.

2.      Specifically, as detailed more fully herein, Defendant Bresnahan participated in the management and operation of the affairs of one or more "association-in-fact" enterprises, described more fully below, and conspired to do so, through a RICO pattern of racketeering activity.

3.      As described herein, Defendant Bresnahan's multiple and repeated acts of doping and entering horses into harness races in the State of New Jersey and elsewhere constituted racketeering activity as defined in 18 U.S.C. § 1961(1)(A); 18 U.S.C. § 1961(1)(B); and N.J.S.A. 2C:41-1(a)(1)(o) in that he:

   a.   engaged in illegal gambling which is chargeable under a New Jersey law prohibiting the rigging of a publicly held contest, N.J.S.A. § 2C:21-11, which is punishable by imprisonment for more than one year; and

   b.   violated U.S.C. § 1952(a)(3) by traveling in interstate commerce and using a facility in interstate and foreign commerce, that is, the simulcast broadcasting by wire and television of races at the Meadowlands Racetrack and other tracks, to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of activities in violation of the laws of New Jersey, specifically, the rigging of a publicly exhibited contest in violation of N.J.S.A. § 2C:21-11.

4.      Further, Defendant Bresnahan's multiple and repeated acts of doping and entering horses into harness races in the State of New Jersey and elsewhere constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and N.J.S.A. 2C:41-1(a) as he has committed at least three predicate acts of racketeering within a ten-year period which are

related and, as a result of his continued involvement in harness racing, pose a threat of continuing criminal activity extending indefinitely into the future.

5.     Plaintiff's claims also involve conspiracies between Defendant Bresnahan and other owners to commit the above described acts to rig publicly held contests through a pattern of racketeering activity.

6.     For example, on January 15, 2016, Defendants entered a doped horse, Tag Up and Go, into a harness race at New Meadowlands Racetrack, LLC, in Rutherford, New Jersey ("Meadowlands" or "Racetrack") and won a significant amount from the race's purse as part of a horse doping scheme in harness racing betting.

7.     Defendant Bresnahan's unlawful conduct, directly injured Mr. Tretter in his business and property.  Specifically, on January 15, 2016, Mr. Tretter bet upon the horse that finished in second place behind the drugged horse, Tag Up and Go, at the harness race at the Meadowlands on January 15, 2016.  Plaintiff would have won $31,835.50 but for the illegal, drug induced win by Tag Up and Go.  Thus, Mr. Tretter is entitled to bring a civil action against Defendants pursuant to 18 U.S.C. § 1964(c).

8.     Defendant Bresnahan and Defendant J.L. Sadowsky further engaged in common law and equitable fraud in that Defendants misrepresented to bettors that they a) entered a horse that complied with the race track rules; b) that the misrepresentation was material because pari-mutuel wagering cannot function without fairness and administering a banned substance to a horse is antithetical to the spirit of fair competition; c) Defendants knew or believed that their representation was false; d) Defendants intended that bettors such as Mr. Tretter would rely on their misrepresentation to induce them to make wagers, as a track's purse structure comes directly from the total amount bet by the public; e) Mr. Tretter relied on these

misrepresentations; f) Mr. Tretter was damaged by Defendants' misrepresentations through the loss of his bets and winnings.

## PARTIES AND OTHER PARTICIPANTS

9.      Plaintiff Jeffrey Tretter resides at 3139 Yale Drive, Granite City, Illinois, 62040 and is a part-time, pari-mutuel sports racing bettor.

10.     Defendant Robert Bresnahan, Jr., resides at 141 Shinnecock Dr., Manalapan, New Jersey 07726, and is the owner and operator of the Bresnahan Racing Stable, and is a licensed horse trainer of several horses, including Tag Up and Go, and was the trainer of Tag Up and Go during the race in question.

11.     Defendant J.L. Sadowsky, LLC is a New Jersey Limited Liability Company located at 22 Derry Meeting Drive, Manalapan, New Jersey, 07726, and was the owner of Tag Up and Go during the race in question and, upon information and belief, owns other horses at Bresnahan Racing Stable.

12.     Upon information and belief and as set forth herein, Bresnahan Racing Stable is an unincorporated "association-in-fact" established in 1999 in Manalapan, New Jersey.

13.     Upon information and belief, and as set forth below, the Sadowsky-Bresnahan Enterprise is an "association in fact" established as early as, or earlier than December 2015.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d) and the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO"), N.J.S.A. 2C:41-2, as well as common law and equitable fraud.

15.     This Court has jurisdiction over this matter because it presents a federal question under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)-(d), pursuant to 28 U.S.C. § 1331.

16.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

17.     Venue is proper under 28 U.S.C. § 1391(b)(1) and 18 U.S.C. § 1965 because all Defendants reside and transact their affairs in the State of New Jersey.

## FACTS

### I.     The World of Pari-mutuel Betting and Harness Racing

18.     Mr. Tretter is a professional, part-time, pari-mutuel bettor, specializing in betting on harness racing.

19.     Harness racing is a form of horse racing in which the horses race at a specific gait, pulling a two-wheeled cart, called a sulky. Bettors who wish to bet on the races do so by a pari-mutuel betting system.

20.     Pari-mutuel betting is a system used in gambling on events, like harness racing, in which participants finish in a ranked order. All bets of a particular type are placed together in a pool and payoff odds are calculated by sharing the pool among all winning bets after taxes and the "house-take" are removed. The payoff is determined by the pool size minus the "take," and then divided by the number of winning tickets.

21.     Transmitting, re-transmitting, receiving, and rebroadcasting harness races occurring live at an in-state location to one or more out-of-state locations by television or radio, through satellite or other electrical or electronic means, or receiving at an in-state location events

which occur live at an out-of-state location, known as simulcasting, allows bettors to place wages without being physically present at the facilities where the race is occurring live. Race simulcasting also involves transmitting parimutuel wagering information to a central website, so that all bettors, even those in different locations, may participate in the same betting pool.

22.     Live harness races occur at various venues within the United States of America, including Meadowlands Harness Racetrack in Rutherford, New Jersey. These live harness races are simulcast to other various locations via television and through internet betting sites such as TwinSpires.com.

23.     Bettors and members of the public expect that harness racers will give their best effort in every race and that all horses entered in every race will not be racing under the influence of a drug or foreign substance that has been administered in violation of racing rules and regulations.

24.     Individuals who are trainers of racing horses in the State of New Jersey are required to be licensed under and follow New Jersey State laws, rules, and regulations.

25.     These law and regulations provide, among other things, that, "[o]n the day of the race, irrespective of the date, time, and method of administration, no horse entered to start in or participating in any race shall carry in its body any drug and/or substance foreign to the natural horse, excepting external rubs and innocuous compounds." N.J.A.C. § 13:70-14A.1.

26.     These laws also prohibit "tamper[ing] with any person, animal or thing," "with purpose to prevent a publicly exhibited contest from being conducted in accordance with the rules and usages which govern it." N.J.S.A. § 2C:21-11.

27.     Furthermore, all harness racing competitors at Meadowlands and its affiliates must comply with the Racetrack Rules (the "Rules"). *See* Exhibit A, Racing Rules &

Regulations, Regulatory, 1 (2017), Meadowlands Racing & Entertainment, http://www.thebigm.com/uploadedFiles/2017_ RacingRules_ Regs.pdf.

28.     These race track rules prohibit doping horses. Exhibit A, 2 ¶¶ 14-22.

29.     Specifically, the Rules "prohibit all race day medication other than Lasix." Exhibit A, 2 ¶ 14. The Rules also prohibit administration of medication by "anyone other than a licensed veterinarian or vet assistant." *Id*. ¶ 16.

30.     By entering into the contest, the each trainer completes a "Racing Application" and signs the application. Exhibit A, 2 ¶ 1. The conditions within the application "apply in concert with [the] Rules." *Id.* Thus, by entering to compete, the applicants represent that they have abided by the rules. Exhibit A, 2 ¶ 12.

31.     Bettors, including and especially Mr. Tretter, rely on participants' representation that they comport with these laws, regulations, and rules in order to properly determine which horses to bet on.

32.     Defendants intended that bettors rely on representations that trainers and horses entered into the races comply with all rules and regulations in order to encourage wagering in harness racing, thereby increasing the purse total.

## II.     Defendants Violate New Jersey Law and Racing Rules Resulting in Mr. Tretter's Damages

33.     Mr. Tretter conducts in depth research prior to selecting horses upon which to place bets. His research involves analyzing each race in the past and performances of the horse's racing form. As part of this process, Mr. Tretter cross references horses by watching race replays to look for any trouble a horse may have had or how he was driven. He bases his observations and notes and race figures on the understanding that horse doping is banned within harness

racing. As a result, Defendants' misrepresentation that they complied with the laws, regulations, and rules are material.

34.     On January 15, 2016, Mr. Tretter placed several wagers via TwinSpires.com for the January 15, 2016 race at Meadowlands Harness Track.

35.     In the fourth race, Tag Up and Go pulled significantly ahead of all the other horses in the final stretch and won the race, in an effort that was far beyond what his previous racing form and finishes suggested possible. As a result, the horses on which Mr. Tretter placed bets finished second, third, fourth, and fifth, instead of first, second, third, and fourth as he had bet.

36.     Testing revealed from blood samples taken in December 2015 that Tag Up and Go had been doped with a performance-enhancing substance, epogen, more commonly known as EPO, which is banned by Meadowlands. As a result, Defendants were banned from competing at Meadowlands for six months, however Defendants retained the purse and the pari-mutuel bets were not altered.

37.     Upon information and belief, Defendants knew that EPO had been administered to Tag Up and Go as the horse was stabled at Bresnahan Racing Stable and under Defendants' control.

38.     If Tag Up and Go was properly kept from competing because of being doped, Mr. Tretter would have won for the following types of bets: 1) win (bettor picks the horse that wins); 2) place (bettor picks the horse that finishes either first or second); 3) show (bettor picks the horse that finishes first, second, or third); 4) exacta (bettor picks the two horses that finish first and second, in order); 5) trifecta (bettor picks the three horses that finish first, second, and third, in order); 6) superfecta (bettor picks the four horses that finish first, second, third, and fourth, in

order); 7) pick-3 (bettor picks the winners of three successive races); 8) pick-5 (bettor picks the winners of five successive races).

39.     But for the illegal entrance of Tag Up and Go into the race, Mr. Tretter would have won in excess of $31,835.50.

## III.     The RICO Enterprises

### A.     *Bresnahan Racing Stable*

40.     At all relevant times, there has been and continues to be an "association-in-fact" within the meaning of 18 U.S.C. § 1961(4) and N.J.S.A. 2C:41-1(c) ("Bresnahan Racing Stable"). Defendant Robert Bresnahan Jr. established Bresnahan Racing Stable in 1999 in order to train and board horses for the harness racing industry. Upon information and belief, Bresnahan Racing Stable consists of Defendant Bresnahan, the various racing drivers, the shareholders of various racehorses, and the stable employees.

41.     At all relevant times, Bresnahan Racing Stable has been, and continues to be engaged in activities affecting interstate commerce, namely, racing at various tracks around the country and through entering horses into competition in various states, including racetracks in New Jersey, New York, Pennsylvania, and Delaware, through race simulcasting and the rebroadcasting by television or radio of harness races occurring live at Meadowlands or its affiliates to one or more out-of-state locations, and through advertisement of his activities via the Bresnahan Racing Stable Facebook page.

42.     Bresnahan Racing Stable is separate and distinct from Defendant Bresnahan and from each of its members and employees.

43.     As part of its business model, Bresnahan Racing Stable either trains horses owned by other parties or offers partnerships to purchase shares of racehorses for the common purpose of training, entering, and racing harness racing horses ("Standardbreds") in order to obtain a

portion of the profits from horse winnings, including casino revenues when applicable. To accomplish this purpose, Defendant Bresnahan has used EPO or other similar performance enhancing drugs to rig publicly held contests.

44.     Upon information and belief, Bresnahan Racing Stable has operated as a continuing unit since 1999, demonstrating sufficient longevity to permit those associated with the enterprise to pursue the enterprise's purpose, and has continued despite multiple doping violations.

45.     Upon information and belief, each member of Bresnahan Racing Stable performs a role in the group consistent with its organizational structures, which furthers the activities of Bresnahan Stable. For example, Defendant Bresnahan owns Bresnahan Racing Stable and is a licensed trainer who trains and races Standardbreds. As owner of Bresnahan Racing Stable, Defendant Bresnahan conducts the affairs of the enterprise by directing and controlling the training of the horses.

46.     As owner of Bresnahan Racing Stable, trainer, and owner of individual horses, Defendant Bresnahan profits by the performance of any horse he enters in a race that finished in first, second, or third place.

   B.     *The J.L. Sadowsky, LLC Enterprise*

47.     Defendant J.L. Sadowsky, LLC is a New Jersey limited liability company and therefore a legal entity within the meaning of 18 U.S.C. § 1961(4) and N.J.S.A. 2C:41-1(c) ("Sadowsky Enterprise")

48.     Upon information and belief, Defendant J.L. Sadowsky is the owner of several Standardbreds trained by Defendant Bresnahan, including Tag Up and Go. As trainer of Defendant J.L. Sadowsky's horses, Defendant Bresnahan conducts the affairs of the enterprise by directing and controlling the training of the horses.

49.     The Sadowsky Enterprise has been, and continues to be engaged in activities affecting interstate commerce, namely, racing at various tracks around the country and through entering horses into competition in various states, including racetracks in New Jersey, New York, Pennsylvania, and Delaware, through race simulcasting and the rebroadcasting by television or radio of harness races occurring live at Meadowlands or its affiliates to one or more out-of-state locations.

50.     As trainer of the horses for the Sadowsky Enterprise, Defendant Bresnahan profits by the performance of any horse he enters in a race that finished in first, second, or third place.

C.     *The Sadowsky-Bresnahan Enterprise*

51.     At all relevant times, there has been and continues to be an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4) and N.J.S.A. 2C:41-1(c) ("Sadowsky-Bresnahan Enterprise"). The enterprise consists of Bresnahan Racing Stable and Defendant J.L. Sadowsky, LLC as Defendant J.L. Sadowsky boards and trains its horses at Bresnahan Racing Stable in Manalapan, New Jersey.

52.     At all relevant times, The Sadowsky-Bresnahan Enterprise has been, and continues to be engaged in activities affecting interstate commerce, namely, racing at various tracks around the country and through entering horses into competition in various states, including racetracks in New Jersey, New York, Pennsylvania, and Delaware, through race simulcasting and the rebroadcasting by television or radio of harness races occurring live at Meadowlands or its affiliates.

53.     The Sadowsky-Bresnahan Enterprise is separate and distinct from the members themselves.

54.     Defendant J.L. Sadowsky and Bresnahan Racing Stable are associated together for the common purpose of raising, training, and racing horses in order to win harness races,

thereby collecting the winnings. To accomplish this purpose, however, Defendant Bresnahan has conducted the Sadowsky-Bresnahan Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and N.J.S.A. 2C:41-1(d) as described more fully below by using EPO or other similar performance enhancing drugs to rig publicly held contests.

55.     The Sadowsky-Bresnahan Enterprise has operated as a continuing unit since at least December 2015 and continues to this day, demonstrating sufficient longevity to permit those associated with the enterprise to pursue the enterprise's purpose, as the partnership is ongoing and has continued despite the multiple doping violations.

56.     Each member of the Sadowsky-Bresnahan Enterprise performs a role in the group consistent with its organizational structure. For example, as owner of Bresnahan Racing Stable, Defendant Bresnahan conducts the affairs of the Sadowsky-Bresnahan enterprise by directing and controlling the training of J.L. Sadowsky's horses and entering them into various races inside and outside the State of New Jersey.

### IV.     Defendant's Pattern of Racketeering Activity

57.     Since at least October 25, 2012, and continuing through the present, Defendant Bresnahan has participated in the conduct of affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and N.J.S.A. 2C:41-1(d) and has conspired to do so.

58.     Beginning in or around October 2012, Defendant Bresnahan began to operate and manage the affairs of Bresnahan Racing Stable through a pattern of racketeering activity.

59.     Upon information and belief, Defendant Bresnahan also conspired with Defendant J.L. Sadowsky within the meaning of 18 U.S.C. § 1962(d) and other horse owners to receive income from rigging publicly exhibited contests across New Jersey and in other states in violation of N.J.S.A. § 2C:21-11.

A.     *State and Federal Statutory Violations*

60.     Defendant Bresnahan's multiple and repeated acts of doping and entering horses into harness races in the State of New Jersey constituted racketeering activity as defined in 18 U.S.C. § 1961(1)(A); 18 U.S.C. § 1961(1)(B); and N.J.S.A. 2C:41-1(a)(1)(o).

61.     The racketeering activity includes New Jersey gambling offenses punishable by imprisonment of more than one year; specifically rigging publicly exhibited contests in violation of N.J.S.A. § 2C:21-11 by tampering with an animal thereby preventing harness racing from being conducted in accordance with the rules and usages which govern it.

62.     The racketeering activity includes violations of the Travel Act, 18 U.S.C. § 1952(a)(3) through horse doping in pari-mutuel sports betting. Defendants have traveled and used a facility in interstate and foreign commerce, that is, the simulcast broadcasting by wire and television of races at Meadowlands and other tracks, to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of activities in violation of the laws of New Jersey, specifically, the rigging of a publicly exhibited contest in violation of N.J.S.A. § 2C:21-11.

B.     *Relatedness*

63.     Defendants' acts are not isolated events; rather they are related to each other in that they have similar purposes, participants, methods of commission, and other distinguishing characteristics. Relatedness is also established by the fact that all acts were done for the purpose of winning harness races.

64.     On October 25, 2012, Defendant Bresnahan was disciplined by the United States Trotting Association for doping the horse Mr. Caviar with Oxymorphone.

65.     In January 2016, test results confirmed that blood drawn from Tag Up and Go in December 2015 contained the performance enhancing substance, EPO.

66.     Upon information and belief, less than a month later, tests confirmed that another of Defendant Bresnahan's horses, Game of Dreamers, tested positive for the same performance enhancing substance, EPO.

67.     Defendant Bresnahan's confirmed acts of horse doping in October 2012, December 2015, and January 2016 further his goal of collecting the winning purse from the events in which his horses compete.

C.     *Continuity*

68.     Defendant Bresnahan's related racketeering acts have extended from at least October 2012 as described in Section IV(B) above.

69.     These related predicate acts involve a continued threat of long-term racketeering activity. There is no foreseeable ending point to Defendant Bresnahan's acts of racketeering against bettors like Mr. Tretter.

70.     Defendant Bresnahan, despite having been banned from race tracks in the past for doping, continues to train horses and enter them into harness racing competitions to this day.

**FIRST CAUSE OF ACTION**
**Violations of the federal RICO Act, 18 U.S.C. § 1962(c)**
**(Against Defendant Bresnahan)**

71.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

72.     Mr. Tretter is a person or entity "capable of holding a legal or beneficial interest in property" and thus, is a "person" within the meaning of 18 U.S.C. § 1961(3).

73.     Defendant Bresnahan is also a person or entity "capable of holding a legal or beneficial interest in property" and thus, is a "person" within the meaning of 18 U.S.C. § 1961(3).

74.     Bresnahan Racing Stable is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962(c). The Bresnahan Racing Stable was engaged in activities affecting interstate commerce at all times relevant to this complaint.

75.     The Sadowsky Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962(c). The Sadowsky Enterprise was engaged in activities affecting interstate commerce at all times relevant to this complaint.

76.     The Sadowsky-Bresnahan Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962(c). The Sadowsky-Bresnahan Enterprise was engaged in activities affecting interstate commerce at all times relevant to this complaint.

77.     Defendant Bresnahan was associated with the enterprises of Bresnahan Racing Stable, the Sadowsky Enterprise, and the Sadowsky-Bresnahan Enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of each enterprise through a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and 1961(5).

78.     Defendant Bresnahan has conducted or participated, directly or indirectly, in the conduct of the enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

79.     The pattern of racketeering activity under 18 U.S.C. §§ 1961(1)(A) and (5) includes the multiple, repeated, and continuous acts of engaging in gambling chargeable under New Jersey law prohibiting the rigging of a publicly held contest, N.J.S.A. § 2C:21-11, which is punishable by imprisonment for more than one year.

80.     The pattern of racketeering activity under 18 U.S.C. §§ 1961(1)(B), (5), and 18 U.S.C. § 1952(a)(3) also includes traveling in interstate commerce and using a facility in interstate and foreign commerce, that is, the simulcast broadcasting by wire and television of

races at Meadowlands and other tracks, to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of activities in violation of the laws of New Jersey, specifically, the rigging of a publicly exhibited contest in violation of N.J.S.A. § 2C:21-11.

81.     Defendants have committed these activities for the express purpose of preventing a publicly exhibited contest from being conducted in accordance with the rules and usages which govern it in violation of N.J.S.A. § 2C:21-11.

82.     As a direct result of Defendants' violation of 18 U.S.C. §§ 1962(c), Plaintiff has suffered substantial injury to his business or property within the meaning of 18 U.S.C. §§ 1964(c), including damages in the amount of at least $31,835.50.

### SECOND CAUSE OF ACTION
**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c)**
**(Against Defendant Bresnahan)**

83.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

84.     Mr. Tretter is a person or entity "capable of holding a legal or beneficial interest in property" and thus, is a "person" within the meaning of 18 U.S.C. § 1961(3).

85.     Defendant Bresnahan is also a person or entity "capable of holding a legal or beneficial interest in property" and thus, is a "person" within the meaning of 18 U.S.C. § 1961(3).

86.     Bresnahan Racing Stable is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The Bresnahan Racing Stable was engaged in activities affecting interstate commerce at all times relevant to this complaint.

87. The Sadowsky Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The Sadowsky Enterprise was engaged in activities affecting interstate commerce at all times relevant to this complaint.

88. The Sadowsky-Bresnahan Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962(c). The Sadowsky-Bresnahan Enterprise was engaged in activities affecting interstate commerce at all times relevant to this complaint.

89. Defendant Bresnahan conspired with one Defendant J.L. Sadowsky and other horse owners within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c). Specifically, upon information and belief, Defendant Bresnahan agreed with Defendant J.L. Sadowsky and/or other horse owners, to conduct or participate, directly or indirectly, in the management and operation of the affairs of Bresnahan Racing Stables and/or the Sadowsky-Bresnahan Enterprise, through a pattern of racketeering activity 18 U.S.C. §§ 1961(1) and (5).

90. Defendant Bresnahan has conducted or participated, directly or indirectly, in the conduct of the enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

91. The pattern of racketeering activity under 18 U.S.C. §§ 1961(1)(A) and (5) includes the multiple, repeated, and continuous acts of engaging in gambling chargeable under New Jersey law prohibiting the rigging of a publicly held contest, N.J.S.A. § 2C:21-11 which is punishable by imprisonment for more than one year.

92. The pattern of racketeering activity under 18 U.S.C. §§ 1961(1)(B), (5), and 18 U.S.C. § 1952(a)(3) also includes traveling in interstate commerce and using a facility in interstate and foreign commerce, that is, the simulcast broadcasting by wire and television of races at Meadowlands and other tracks, to promote, manage, establish, carry on, or facilitate the

17

promotion, management, establishment, or carrying on of activities in violation of the laws of New Jersey, specifically, the rigging of a publicly exhibited contest in violation of N.J.S.A. § 2C:21-11.

93.    Defendants have committed these activities for the express purpose of preventing a publicly exhibited contest from being conducted in accordance with the rules and usages which govern it in violation of N.J.S.A. § 2C:21-11.

94.    As a direct result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiff has suffered substantial injury to his business or property within the meaning of 18 U.S.C. § 1964(c), including damages in the amount of at least $31,835.50.

## THIRD CAUSE OF ACTION
### Violations of the NJRICO Act, N.J.S.A. 2C:41-2
### (Against Defendant Bresnahan)

95.    All paragraphs set forth above are incorporated by reference as if fully set forth herein.

96.    Mr. Tretter is a person or entity "capable of holding a legal or beneficial interest in property" and thus, is a "person" within the meaning of N.J.S.A. 2C:41-1(b).

97.    Defendant Bresnahan is also a person or entity "capable of holding a legal or beneficial interest in property" and thus, is a "person" within the meaning of N.J.S.A. 2C:41-1(b).

98.    Bresnahan Racing Stable is an "enterprise" within the meaning of N.J.S.A. 2C:41-1(c). The Bresnahan Racing Stable was engaged in activities affecting trade or commerce within the meaning of N.J.S.A. 2C:41-1(h) at all times relevant to this complaint.

99.     The Sadowsky Enterprise is an "enterprise" within the meaning of N.J.S.A. 2C:41-1(c). The Sadowsky Enterprise was engaged in activities affecting trade or commerce within the meaning of N.J.S.A. 2C:41-1(h) at all times relevant to this complaint.

100.    The Sadowsky-Bresnahan Enterprise is an "enterprise" within the meaning of N.J.S.A. 2C:41-1(c). The Sadowsky-Bresnahan Enterprise was engaged in activities affecting trade or commerce within the meaning of N.J.S.A. 2C:41-1(h) at all times relevant to this complaint.

101.    Defendant Bresnahan was associated with the enterprises of Bresnahan Racing Stable, the Sadowsky Enterprise, and the Sadowsky-Bresnahan Enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of each enterprise through a pattern of racketeering activity under N.J.S.A. 2C:41-2(c).

102.    Defendant Bresnahan has conducted or participated, directly or indirectly, in the conduct of the enterprise through predicate acts of racketeering activity within the meaning of N.J.S.A. 2C:41-1(a)(1)(o) by rigging a publicly exhibited contest in violation of N.J.S.A. 2C:21-11(a)(2).

103.    The pattern of racketeering activity under N.J. S.A. 2C:41-1(d)(1)-(2) includes the multiple, repeated, and continuous acts of rigging a publicly exhibited contest in violation of N.J.S.A. 2C:21-11(a)(2).

104.    Defendants have committed these activities for the express purpose of preventing a publicly exhibited contest from being conducted in accordance with the rules and usages which govern it in violation of N.J.S.A. § 2C:21-11.

105.    As a direct result of Defendants' violation of N.J.S.A. 2C:41-2(c), Plaintiff has suffered damages within the meaning of N.J.S.A. 2C:41-4(c), including damages in the amount of at least $31,835.50.

**FOURTH CAUSE OF ACTION**
**Violation of N.J.S.A. 2C:41-2(d) by Conspiring to Violate N.J.S.A. 2C:41-2(c)**
**(Against Defendant Bresnahan)**

106.    All paragraphs set forth above are incorporated by reference as if fully set forth herein.

107.    Mr. Tretter is a person or entity "capable of holding a legal or beneficial interest in property" and thus, is a "person" within the meaning of N.J.S.A. 2C:41-1(b).

108.    Defendant Bresnahan is also a person or entity "capable of holding a legal or beneficial interest in property" and thus, is a "person" within the meaning of N.J.S.A. 2C:41-1(b).

109.    Bresnahan Racing Stable is an "enterprise" within the meaning of N.J.S.A. 2C:41-1(c). The Bresnahan Racing Stable was engaged in activities affecting trade or commerce within the meaning of N.J.S.A. 2C:41-1(h) at all times relevant to this complaint.

110.    The Sadowsky Enterprise is an "enterprise" within the meaning of N.J.S.A. 2C:41-1(c). The Sadowsky Enterprise was engaged in activities affecting trade or commerce within the meaning of N.J.S.A. 2C:41-1(h) at all times relevant to this complaint.

111.    The Sadowsky-Bresnahan Enterprise is an "enterprise" within the meaning of N.J.S.A. 2C:41-1(c). The Sadowsky-Bresnahan Enterprise was engaged in activities affecting trade or commerce within the meaning of N.J.S.A. 2C:41-1(h) at all times relevant to this complaint.

112.    Defendant Bresnahan conspired with one Defendant J.L. Sadowsky and other horse owners within the meaning of N.J.S.A. 2C:41-2(d) to violate N.J.S.A. 2C:41-2(c).

Specifically, upon information and belief, Defendant Bresnahan agreed with Defendant J.L. Sadowsky and/or other horse owners, to conduct or participate, directly or indirectly, in the management and operation of the affairs of Bresnahan Racing Stables and/or the Sadowsky-Bresnahan Enterprise, through a pattern of racketeering activity as defined in N.J.S.A. 2C:41-1(d) and N.J.S.A. 2C:41-2(c).

113.    Defendant Bresnahan has conducted or participated, directly or indirectly, in the conduct of the enterprises through a pattern of racketeering activity within the meaning of N.J.S.A. 2C:41-2(c).

114.    The pattern of racketeering activity under N.J.S.A. 2C:41-1(d) and N.J.S.A. 2C:41-2(c) includes the multiple, repeated, and continuous acts of engaging in gambling chargeable under New Jersey law prohibiting the rigging of a publicly held contest, N.J.S.A. § 2C:21-11 which is punishable by imprisonment for more than one year.

115.    Defendants have committed these activities for the express purpose of preventing a publicly exhibited contest from being conducted in accordance with the rules and usages which govern it in violation of N.J.S.A. § 2C:21-11.

116.    As a direct result of Defendants' violation of N.J.S.A. 2C:41-2(c), Plaintiff has suffered substantial injury to his business or property within the meaning of N.J.S.A. 2C:41-4(c), including damages in the amount of at least $31,835.50.

**FIFTH CAUSE OF ACTION**
**Common Law Fraud**
**(Against All Defendants)**

117.    All paragraphs set forth above are incorporated by reference as if fully set forth herein.

118.    Defendants misrepresented to bettors that they entered a horse that complied with the race track rules, including and especially those regarding horse doping, by virtue of the representations made within their "Racing Application" and presenting a horse as compliant with race rules.

119.    Upon information and belief, the Racing Application binds both the trainers and owners to the representations made within the Racing Application.

120.    The misrepresentation was material because pari-mutuel wagering cannot function without fairness and administering a banned substance to a horse is antithetical to the spirit of fair competition.

121.    Upon information and belief, defendants knew or believed that their representation was false.

122.    Defendants intended that bettors such as Mr. Tretter would rely on their misrepresentation to induce them to make wagers, as a track's purse structure and bet payouts come directly from the total amount bet by the public.

123.    Mr. Tretter relied on these misrepresentations when researching and selecting horses upon which to place his bets.

124.    Mr. Tretter was damaged due to Defendants' misrepresentations through the loss of his bets and winnings.

### SIXTH CAUSE OF ACTION
**Equitable Fraud**
**(Against All Defendants)**

125.    All paragraphs set forth above are incorporated by reference as if fully set forth herein.

126.    Defendants misrepresented to bettors that they entered a horse that complied with the race track rules, including and especially those regarding horse doping, by virtue of the representations made within their "Racing Application."

127.    Upon information and belief, the Racing Application binds both the trainers and owners to the representations made within the Racing Application.

128.    The misrepresentation was material because parimutuel wagering cannot function without fairness and administering a banned substance to a horse is antithetical to the spirit of fair competition.

129.    Defendants intended that bettors such as Mr. Tretter would rely on their misrepresentation to induce them to make wagers, as a track's purse structure comes directly from the total amount bet by the public.

130.    Mr. Tretter relied on these misrepresentations when researching and selecting horses upon which to place his bets.

131.    Mr. Tretter was damaged due to Defendants' misrepresentations through the loss of his bets.

## **REQUEST FOR RELIEF**

WHEREFORE, - Plaintiff requests judgment against Defendants as follows:

A.    awarding damages in favor of Plaintiff against Defendant Bresnahan with interest thereon, for the state and federal RICO claims;

B.    awarding damages against all Defendants, jointly and severally, together with interest thereon for the common law fraud claims;

C.    awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    ordering Defendants to pay the amount Mr. Tretter would have won, but for the illegal doping of Tag Up and Go;

E.    awarding Plaintiff treble, consequential, and punitive damages; and

F.    awarding Plaintiff such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury for each and every one of the foregoing claims so triable.

Dated:  March 7, 2018                              Respectfully submitted,

**K&L GATES, LLP**

By: _/s/_ Michael E. Waller_____

***Attorneys for Plaintiff***
***Jeffrey Tretter***
Michael E. Waller
  Michael.Waller@klgates.com
Alyssa F. Conn
  Alyssa.Conn@klgates.com
**K&L GATES LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
(973) 848-4000
(973) 848-4001 (fax)